**IN THE COURT OF APPEALS OF IOWA**

No. 15-0543
Filed September 23, 2015

**IN THE INTEREST OF D.L.,**
 **Minor Child,**

**K.L., Mother,**
 Appellant.
_____

        Appeal from the Iowa District Court for Cherokee County, Mary L. Timko,

Associate Juvenile Judge.


        A mother appeals an order terminating her parental rights.  **AFFIRMED.**


        Elizabeth Specketer of Specketer Law Firm, Rembrandt, for appellant.

        Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant

Attorney General, Ryan Kolpin, County Attorney, and Kristal Phillips, Assistant

County Attorney, for appellee

        Lesley Rynell of Juvenile Law Center, Sioux City, attorney and guardian

ad litem for minor child.


        Considered by Doyle, P.J., and Tabor and Bower, JJ.

**TABOR, Judge.**

The juvenile court ordered termination of the relationship between D.L. and his mother Karie under Iowa Code section 232.116(1)(g) and (i) (2013). On appeal, Karie argues the State failed to prove the grounds for termination by clear and convincing evidence and the court should have given her an additional six months to work toward reunification.

We affirm the termination order, finding Karie continues to lack the ability or willingness to respond to services that would correct the "dysfunction and chaos" into which D.L. was born. Moreover, because Karie has been involved with child-in-need-of-assistance (CINA) proceedings for her older children, dating back at least eight years, we do not believe an extension of time in this case would result in a safer environment for D.L.

## I.     Background Facts and Proceedings

Karie gave birth to D.L., her tenth child, in July 2014.[1] The birth came one year after our court upheld the termination of her parental rights to three other children. *See In re M.B. Jr.*, No. 13-0818, 2013 WL 3873266 (Iowa Ct. App. July 24, 2013). In that appeal we also upheld the termination of the parental rights of M.B.'s father, Martin, who reportedly threatened Karie with a knife, among other acts of domestic violence. *Id.*

After the termination of her parental rights to those three children, Karie married James, a registered sex offender, who eventually went to prison. While James was in prison, Karie conceived D.L. with her ex-husband Martin. In

---

[1] Karie testified she did not have custody of any of her children.

August 2014, when D.L. was one month old, the Iowa Department of Human Services (DHS) learned of D.L.'s birth and visited Karie to be sure the home environment was safe. The DHS created a safety plan with Karie based on her representations, later determined to be untrue, regarding who was living in her home and who had contact with D.L. Karie initially refused to disclose the identity of D.L.'s biological father, but eventually revealed that Martin was the baby's father.

Because Karie was not truthful and failed to follow the safety plan, the DHS removed D.L. from her custody and placed him in foster care. The DHS raised concerns that circumstances leading to the 2013 termination had not been corrected, including the fact that both James and Martin stayed in the home with D.L. on occasion.

The DHS filed a CINA petition in August 2014. Following an adjudication hearing in September, the juvenile court concluded that little had changed since the 2013 termination of parental rights. In November 2014, the DHS approved Karie for an extra ten hours of supervised visitation per week. She participated in family safety, risk, and permanency (FSRP) services; mental health counseling; and worked with Early Head Start, informal supports, and a parent partner. Karie also tried to address her anger management issues with her counselor and by reading self-help books and articles.

Despite those endeavors, in November and December 2014, the juvenile court held a dispositional hearing where Karie stipulated to a waiver of reasonable efforts. She also consented to a termination of her parental rights to

D.L. But one week later she withdrew her consent and challenged the waiver of reasonable efforts. The State filed a petition to terminate parental rights in December 2014. The juvenile court held a permanency and termination hearing in January 2015.

In March 2015, the juvenile court entered a detailed order terminating Karie's parental rights.[2] In making this determination, the court considered the mother's continued struggles with anger control, dishonesty, relationships with inappropriate persons, and unstable housing and employment. The court also discussed Karie's progress, noting she participated in mental health therapy, though she revoked consent for the DHS to speak with her therapist, and had formed a few healthy, supportive relationships.

The juvenile court concluded Karie's "inability to establish boundaries with negative people who could and have caused harm to her and her children is perhaps one of the most significant issues in this case." The court reasoned: "Safety cannot be assured for [D.L.]. Nor can the court find that safety would be assured for him within six months." The court emphasized that Karie "has been receiving services for the past six years. Unfortunately, she has been unable to overcome the barriers preventing her from maintaining a safe, stable, nurturing, and healthy living environment for her children."

---

[2] D.L.'s biological father, Martin, consented to the termination of his parental rights and was excused from the proceedings upon his request. The juvenile court dismissed the legal father, James, as a necessary party from the proceedings. *See In re J.C.*, 857 N.W.2d 495, 505 (Iowa 2014). Neither father is involved in this appeal.

The juvenile court noted Karie and D.L. appeared to have an attachment, but it did not rise to the level that the court would consider not terminating her parental rights. The court further explained:

> Some of the individual incidents cited may seem trivial and other concerns may appear to be nebulous, however, that evidence must be viewed in its totality to determine how safe [D.L.] would be under the care of [his mother]. The record thus shows that [D.L.] could not be returned to the care of his mother or father at this time.

Karie now appeals.

## II. Standard of Review

We review termination-of-parental-rights proceedings de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). We give weight to the factual determinations of the juvenile court, especially with regard to witness credibility, but are not bound by them. *In re A.B.,* 815 N.W.2d 764, 773 (Iowa 2012). D.L.'s best interests remain our primary consideration. *See id.* at 776.

## III. Analysis

On appeal, Karie challenges the sufficiency of the evidence to prove the grounds for termination and, alternatively, asserts "she deserves an additional six months to work toward reunification" with D.L., given the strides she has made.

The juvenile court terminated Karie's parental rights under section 232.116(1)(g) and (i). When a juvenile court terminates parental rights on more than one ground, we may affirm the order on any of the statutory grounds supported by clear and convincing evidence. *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). Evidence is clear and convincing when there is no serious or

substantial doubt as to the correctness of the conclusions of law drawn from the evidence. *Id.* at 706. We affirm under paragraph (g).

Termination of parental rights under paragraph (g) requires the court to find the State proved all of the following:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (2) The court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family . . . .
> (3) There is clear and convincing evidence that the parent continues to lack the ability or willingness to respond to services which would correct the situation.
> (4) There is clear and convincing evidence that an additional period of rehabilitation would not correct the situation.

Iowa Code § 232.116(1)(g).

Karie argues the State failed to prove elements (3) and (4). She contends that she has substantially complied with services and the FSRP worker had no worries regarding her interactions with D.L. She notes she has a positive relationship with D.L.'s foster parents and has provided them with supplies to help support him. Karie also contends domestic violence and neglect, concerns in the earlier termination case, have not been issues in the present case.

But Karie acknowledges she continues to struggle to communicate appropriately and control her anger with the DHS worker and others involved in the case. She also continues to engage in relationships with dangerous men and lies about her associations. Further, she acknowledges her failure to maintain consistent employment or housing. Karie moved about one week before the termination hearing without first speaking with or notifying any of her caseworkers or service providers regarding her move.

We recognize Karie has taken steps toward providing a safe home for D.L., but her progress was limited. She has been involved with the DHS since 2009. One of the primary reasons for the 2013 termination was her dysfunctional relationship with Martin. But instead of severing ties with him, she chose him to be the father of another child. Martin provided Karie with transportation, including to and from the hospital for D.L.'s birth. He also helped with her paper route, did chores around her house, and lived in her home on the weekends following D.L.'s birth. Karie continued to speak with Martin even after D.L. was removed, and in December 2014 agreed to work to raise bail money when Martin was arrested for sexually assaulting her daughter, E.W.[3] We agree with the juvenile court's assessment that Karie's continued involvement with Martin shows her lack of ability or willingness to respond to services that would correct the circumstances that led to the termination of her rights to three children in 2013. *See In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa Ct. App. 1988) (noting a parent "must acknowledge and recognize the abuse before any meaningful change can occur").

Martin was not the only inappropriate person to have access to D.L. Karie also allowed her current husband, James,[4] who is a registered sex offender, to return home after he was released from jail in August 2014, when D.L. was less than one month old. Karie acknowledged James acted as D.L.'s caretaker when she worked. Karie also allowed another male acquaintance to babysit D.L.,

[3] These charges were dismissed in January 2015.
[4] The record indicates Karie has filed for divorce from James.

knowing he was considered to be unsafe by the DHS worker. In addition, despite the DHS mandates that she not open her home to additional people, Karie allowed a teenager and her boyfriend down on their luck to live there—in the words of the juvenile court, "it appears she ran a sort of 'hostel' for people who had nowhere else to go." Karie eventually asked the couple to leave, but later asked the DHS worker when the teenager could move back in.

Additionally, Karie's inability to control her anger remains a concern. The juvenile court noted that she displayed a "quick temper and inability to maintain her composure or train of thought" when questioned about inconsistences during her testimony before the court.

The record contains clear and convincing evidence that Karie cannot provide a secure home for D.L. because she "continues to lack the ability or willingness to respond to services which would correct the situation." This element was supported by evidence that Karie hangs onto dangerous liaisons, lies about them to the DHS and the court, battles with anger issues, and struggles to maintain consistent employment and housing. *See* Iowa Code § 232.116(1)(g)(3). We find these concerns will continue and an additional period of rehabilitation will not correct them. *See* Iowa Code §§ 232.116(1)(g)(4), 232.104(2)(b).

Karie's minimal progress after years of DHS involvement foretells that giving her another six months will only postpone the permanency to which D.L. is entitled. *See In re A.B.*, 815 N.W.2d at 778 (explaining "[e]vidence of the parent's past performance may be indicative of the quality of the future care that

parent is capable of providing"). "Our statutory termination provisions are preventative as well as remedial. Their goal is to prevent probable harm to the child; they do not require delay until after the harm has happened." *In re T.A.L.*, 505 N.W.2d 480, 483 (Iowa 1993) (citation omitted). We do not need to wait for D.L. to suffer the same harm suffered by his siblings. Therefore, we affirm the juvenile court's denial of an additional six months.

The record shows D.L. is adoptable. He has spent nearly his entire life in foster care. Karie agrees with D.L.'s guardian ad litem and the State that if he cannot be returned home, he should remain in the care of his foster parents who wish to adopt him. Termination will provide D.L. with permanency and stability. "We do not gamble with the children's future by asking them to continuously wait for a stable biological parent, particularly at such tender ages." *In re D.W.*, 791 N.W.2d at 707 (internal quotation marks omitted). Karie does not argue on appeal that termination would not be in D.L.'s best interests under section 232.116(2) or that any of the permissive factors in section 232.116(3) should be applied. Accordingly, we affirm the juvenile court's order regarding those provisions.

**AFFIRMED.**